FILED
01 MAY 14 PM 2:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JONETA RICKS,

Plaintiff,

vs.

MINNESOTA MINING AND MANUFACTURING,

Defendant.

CV-98-RRA-1463-S
CV-00-RRA-0560-S

ENTERED
MAY 1 4 2001

## MEMORANDUM OPINION

The plaintiff is a black woman who was hired by 3M on May 24, 1977, as a records clerk, at the Guin, Alabama plant.[1] She was supervised by Lynn Gordon from 1986-1989, and by Jerry Spann from 1989 until the plaintiff left 3M in March 30, 1999. Gordon also acted as the plaintiff's manager from 1991 until the plaintiff's departure. Ron Schalk was the plant manager. Marguerite Kelley was the plant human resources manager.

In 1997, five persons applied for the job of materials control scheduler, including the plaintiff. The three-person interview team was comprised of Gordon, materials

[1] The plaintiff began her work at 3M as an Order Records Clerk. In February of 1986, she was promoted to Advanced Orders Record Clerk. She was promoted again in April of 1994, to Senior Order Services Clerk. These jobs have been given various names in the parties' briefs and evidentiary submissions, but "Advanced Orders Record Clerk" and "Senior Order Services Clerk" are the titles stated in the official personnel records submitted by the defendant. Apparently, the first job the plaintiff had with 3M was either "Records Clerk," "Orders Receivers Clerk," or "Orders Record Clerk." (The plaintiff was promoted over white competition.)



control manager, Russell, plant human resources supervisor, and Spann, all of whom are white. On their interview sheets, Gordon and Spann stated that they were uncertain as to whether the plaintiff was qualified to be a material controls scheduler, while Russell found the plaintiff qualified. All committee members found Tina Lindley qualified, and she was selected. Lindley began working for 3M in 1993. At the time of her selection in 1997 for the position in question, Lindley held the position of advanced transportation coordinator.

The plaintiff filed an EEOC complaint in or around June 16, 1997. When she did not prevail with the EEOC, the plaintiff filed her first lawsuit against 3M, CV-98-RRA-1463-S, alleging that she did not get the position of scheduler because of her race and that 3M engages in a pattern and practice of discriminating against black persons.

For several reasons, Kelley and Gordon recommended to Schalk that the plaintiff's employment be terminated. Schalk made the decision to dismiss the plaintiff. His decision was reviewed and approved by the division human resources manager Mike Neely and other management personnel in St. Paul, Minnesota. The plaintiff then filed another complaint with the EEOC, claiming that she was "aggrieved by the defendant in the nature of a hostile work environment, retaliatory discharge claim, and a race discrimination charge." When she did not get relief from the EEOC, the plaintiff filed

her second lawsuit in this court, CV-00-RRA-0560-S, alleging that she was dismissed because of her race and in retaliation for having filed the first lawsuit, CV-98-RRA-1463-S. The plaintiff states in her second complaint:

> At the time of the plaintiff's termination, she was the only African American employee in this particular division of the 3M plant. Prior to her termination, the defendants interfered with her ability to perform her work, and provided a hostile work environment toward her, not only due to her race, but also due to the fact that she had a pending claim for discrimination against 3M and all of the employees that closely worked with Ms. Ricks were involved by way of discovery or otherwise in regard to this claim for discrimination.

*Complaint*, ¶7, CV-00-RRA-0560-S.

CV-98-RRA-1463-S and CV-00-RRA-0560-S have been consolidated. The defendant has filed summary judgment motions in both cases. The parties have submitted briefs, along with numerous evidentiary submissions. The defendant's motions for summary judgment are now ready to be ruled on.

## Defendant's Motion to Strike Plaintiff's Affidavit

The defendant's motion to strike the plaintiff's affidavit is GRANTED in part and DENIED in part. The motion to strike the "second" paragraph three is DENIED, as the qualifications of Northington and Kerr at the time they became schedulers might be evidence of skills Gordon, Russell, and Spann thought qualified one to be a scheduler.

As to striking the part of paragraph four of the plaintiff's affidavit which states her computer skills or knowledge, the defendant, unless it has been overlooked, has not

informed the court as to where in the plaintiff's depositional testimony this affidavit statement is contradicted. Moreover, the qualifications the plaintiff sets out in her affidavit were stated by the plaintiff in her 1997 interest application. Therefore, the motion to strike the said part of paragraph four is DENIED.

Paragraph six of the affidavit states, in part, "After several meetings, it was our conclusion as a [Hiring/Selection] committee that African-Americans were not being promoted, and that personal favoritism and politics were the basis of hiring decisions as opposed to best qualified and experienced employees." In her affidavit, the plaintiff refers to the task force records. The defendant objects on the grounds of hearsay and the failure to establish the committee documents as business records, irrelevancy, and immateriality." This part of the affidavit will be addressed in the discussion of the plaintiff's assertion that this is a direct evidence case of intentional discrimination.

The remaining objections, however, are sustained, for the reasons stated in the defendant's motion, and those parts of the plaintiff's affidavit are STRICKEN.

<u>Case CV-98-RRA-1463-S</u>

The defendant's motion for summary judgment on the promotion claim will be discussed here, while the termination and retaliation claims will be discussed in a separate

opinion. Of course, the evidence will be viewed in the light most favorable to the plaintiff, the non-movant.

LAW

According to now familiar law, the plaintiff has the duty of establishing a prima facie case that she was passed over for promotion because of her race. A plaintiff may establish a prima facie case through either circumstantial or direct evidence of discriminatory intent. In *Caban-Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990), the Eleventh Circuit stated a test for deciding the sometimes difficult question of whether there is direct evidence of discrimination:

> Although the question of whether a plaintiff has presented direct evidence is not always entirely clear, direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee. *See Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.1988); *Thompkins v. Morris Brown College*, 752 F.2d 558, 563 (11th Cir.1985); *Dunning v. National Industries, Inc.*, 720 F.Supp. at 929 n. 6.

*Id.* at 1555. In *Caban-Wheeler,* the plaintiff was a Hispanic female who claimed that she was dismissed in order to give her job to a black person. The court held that the statement that a certain program needed a black director constituted direct evidence of discrimination. In *Earley v. Champion International Corporation,* 907 F.2d 1077 (11th Cir. 1990), the court stated the direct evidence test another way, and gave an example:

> "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir.1989) (emphasis added); accord *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n. 13 (11th Cir.1988); *Rollins*, 833 F.2d at 1528 n. 6. "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *Carter*, 870 F.2d at 582. One example of direct evidence would be a management memorandum saying, "Fire Farley--he is too old." But the evidence at issue here, at most, suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence; by definition then, the evidence is circumstantial. *Rollins*, 833 F.2d at 1529.

*Id.* at 1081-82. On the other hand, statements, even those made by decision-makers, which merely *suggest* a discriminatory motive, are by definition circumstantial evidence. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961 (11th Cir. 1997) ("These statements . . . however inappropriate they may be are not direct evidence of a discriminatory motive with respect to the appellate's claims of failure to promote . . . .")[2]

---

[2]Circumstantial evidence of discrimination does not require the defendant to shoulder an additional burden of proof. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961 (11th Cir. 1997). On the other hand, when "direct evidence" statements are attributable to the decision-maker, the trier of fact "accepts the ultimate issue of discrimination as proved." *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). When there is direct evidence of discriminatory motive, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). *Caban-Wheeler* states the *McDonnell Douglas* prima facie case of disparate treatment, and explains the effect of direct evidence of discriminatory motive on the *McDonnell Douglas* prima facie framework, particularly the distinction between the burden of production and the burden of persuasion and the shifting of burdens from one party to the other. *Caban-Wheeler v. Elsea*, 904 F.2d at 1554-1555.

If the plaintiff succeeds in establishing a prima facie case, the defendant has the duty of articulating and setting out evidence of legitimate, non-discriminatory reasons for selecting Lindley instead of the plaintiff. If the defendant meets this burden of production, the plaintiff must counter with evidence of pretext. The plaintiff's duty to produce evidence of pretext, however, does not necessarily require the plaintiff to produce additional or different evidence. The evidence which makes up the plaintiff's prima facie case may itself contain evidence sufficient to create factual issues of pretext:

> [T]he same evidence that is used to establish the prima facie case may also cast doubt on the employer's proferred legitimate, non-discriminatory basis for its selection. Thus, in some cases, the plaintiff, in order to prove intentional discrimination, will not need to produce any more evidence that what was required to establish the prima facie case.

*Walker v. Mortham*, 158 F.3d at 1184, FN 2. The ultimate burden of proof, however, always rests with the plaintiff.

In *Walker v. Mortham*, a case cited by the plaintiff, the law with respect to promotion claims was set out.

> "Under our well-established framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. The burden is not onerous. Here, petitioner need only prove by a preponderance of the evidence that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected respondent either continued to seek applicants for the position, or, as is alleged here, filled the position with a white

employee.[3]

> ... [T]he employer [must then] present evidence that the plaintiff was rejected, or the other applicant was chosen, for a legitimate nondiscriminatory reason. Here, respondent presented evidence that it gave the job to the white applicant because she was better qualified for the position, and therefore rebutted any presumption of discrimination that petitioner may have established....
>
> Although petitioner retains the ultimate burden of persuasion, our cases make clear that she must also have the opportunity to demonstrate that respondent's proffered reasons for its decision were not its true reasons. In doing so, petitioner is not limited to presenting evidence of a certain type....
>
> > [Petitioner] might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position. The District Court erred, however, in instructing the jury that in order to succeed petitioner was required to make such a showing.... It was, therefore, error for the District Court to instruct the jury that petitioner could carry her burden of persuasion only by showing that she was in fact better qualified than the white applicant who got the job.
>
> *Id.* at 186-88, 109 S.Ct. at 2378-79 (footnote and citations omitted)."

*Id.* at 1191-92 (quoting *Patterson v. McLean Credit Union,* 805 F.2d 1143, 1147 (4th Cir. 1986).

## DIRECT OR CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION IN THIS CASE

The plaintiff states in her affidavit that there have been a number of incidents at the Guin plant which suggest racial discrimination, that other black persons have been denied promotions, and that the "Hiring and Retention Task Force" acknowledged that

---

[3] After a lengthy discussion, this court held that under Eleventh Circuit case law a plaintiff is not required to establish that he was equally or more qualified than the person who was awarded the job, in order to state a prima facie case of intentional discrimination.

minorities have not been promoted. She states, "After several meetings, it was our conclusion as a committee that African-Americans were not being promoted, and that personal favoritism and politics were the basis of hiring decisions as opposed to best qualified and experienced employees." *Plaintiff's Affidavit*, ¶ 6. The defendant objects to these statements as hearsay.

While the task force report makes comments or poses certain questions concerning minorities, the report does not state that blacks are not being promoted. Moreover, there is no evidence that any of the persons involved in the decision to promote Lindley over the plaintiff did or said anything which could be considered direct evidence of discrimination.[4] This is not a direct evidence case.

JOB REQUIREMENTS OR QUALIFICATIONS

---

[4] Although not included in the section of the plaintiff's brief wherein she contends there is direct evidence of discrimination, the plaintiff asserts elsewhere in her brief that Spann told her that he used the fact of Lindley's being a Native American as a basis to discriminate against her: "Jerry Spann has used Tina Lindley's alleged minority status as grounds for discriminating against Joneta, and he has basically told Joneta this in meetings." *Plaintiff's Brief*, pg. 9. In support of this contention, the plaintiff referenced pages 116-17 of her deposition, which states, ". . .Jerry Spann and I, I was in a meeting with him, and he told me one time that I was not the only minority in his group. And I asked him who the other minority was. And I said - - and he said Tina Lindley. And I said how? He said she is American Indian." Even if Spann made such statements, they do not constitute direct evidence of discrimination. (Spann testified that Lindley's part Native American had nothing to do with her selection.)

The plaintiff is a member of a protected class, and she was replaced by a person outside the protected class.[5] At dispute is whether the plaintiff was qualified for the job. The following factual statements are summary judgment evidence which bear on this question.

*Formal job description*

The formal job description for "Material Controls Scheduler" specifies the following:

1. Gives instructions to converting supervision regarding the operations in the converting department.

2. Allocate stock and customer orders against proper jumbo or stockpile to obtain maximum material utilization via PMCS/GMS systems.

3. Schedule all orders on converting equipment to meet customer requirements; issue schedule.

4. Promise date all orders based on dating policy, material availability, workload, and other criteria.

5. Receive and note converting orders for special requirements such as scoring, splices, special inspection, etc.

6. Make checks on orders not meeting promise date and advise order department of redates.

7. Prepare and analyze workload for determining machine and manpower requirements.

---

[5] Despite some discussion of Lindley's race, the defendant does not appear seriously to challenge the plaintiff's assertion that Lindley is a white person. (Apparently, Lindley's grandfather's great grandmother was a Cherokee Indian.)

8. Coordinate work in converting with other departments or outside vendors.

9. Coordinate problem order/customer requirements with appropriate divisional or plant groups.

10. Adjust and correct PMCS to reflect proper balances, open order, reconcile inventory with cost accounting.

11. Monitor finished goods inventory levels to avoid overstock situation.

12. Recommend and follow through on workable dispositions for restricted finished material.

13. Additional duties as assigned by supervisor.

*Kelley Affidavit,* Attachment C. In its brief, the defendant points out items two and ten. These items appear to be the only ones which use computer terminology.

*Interview summary sheet*

The "Interview Summary Sheet" or "Impression Sheet," which is filled out by the evaluators --- in this case, Russell, Gordon, and Spann --- is an additional source of job requirements. Underneath the words "Materials Control Scheduler" is the statement, "List in priority order the most important duties, skills, and qualifications."[6] In 1997, that list read as follows:

[6] It is not known if the list of "duties, skills, and qualifications" is generic or specific to the job of scheduler. In any case, the result reached in this opinion would not be changed.

No. 1: Perform production control procedures such as planning, scheduling, allocating, order processing, and inventory control.

No. 2: Provide good customer service through accurate and prompt attention to order detail; I.E. color match, special instructions.

No. 3: Demonstrate customer service/communication skills while interacting with internal as well as external customers, and team activities.

No. 4: Maintain information flow among several systems and departments while securing confidential information. Demonstration of leadership skills and team work abilities.

No. 5: Operate PC with windows; work with systems (COMS, CASS, PMCS, GMS, Figures, Pirates,[7] MDCS), familiar with accounting procedures, and software packages (Excel, MS Word, or WordPerfect).

No. 6 High school education or equivalent required; education beyond high school and work experience in materials control or related field desired.

No. 7: Prompt and regular attendance; work occasional overtime; follow safe working procedures.[8]

*Kelley Affidavit*, Exhibit E.[9]

*Gordon's and Lindley's sworn statements*

According to Gordon's affidavit, the scheduler schedules the equipment used to convert the materials manufactured, which requires the use of PC software and internal

---

[7] Pirates was a new labeling system.

[8] Numbers eight, nine, and ten provide only room for comments.

[9] The plaintiff states that the interview impression sheets are "quite vague and subjective," and that the scheduler job "does not require any specific computer background."

systems to receive customer orders. The scheduler must assess factors such as availability of material, equipment and workload, and promise-date all orders. Gordon estimates that approximately ninety percent of the scheduler's time is spent at the computer. Tina Lindley testified that the scheduler primarily uses CASS.

*Northington's and Kerr's qualifications in 1993 and 1994*

The plaintiff states that the qualifications for scheduler have not changed since 1993. She points to the qualifications of Wanda Northington and Carolyn Kerr as they stated them on the interest applications they filled out for the scheduler's job in 1993 and 1994, when they were both order clerks. The plaintiff might be able to use the qualifications of Northington and Kerr at the time they became schedulers as evidence of what 3M requires or desires of order clerks who want to become schedulers.[10]

The plaintiff testified that when Northington and Kerr became schedulers, they were working in the records department, and their duties and work histories were virtually the same as hers. Kerr testified that the plaintiff and she worked in the same office, and that they had some similar duties. Both Kerr and the plaintiff handled orders,

[10] The plaintiff applied for the scheduler jobs that went to Northington and Kerr. She is not, however, presenting discrimination claims concerning those unsuccessful attempts.

but only Kerr worked with outside vendors.

In 1993, when she was applying for the scheduler's job, Kerr stated the following qualifications:

> Knowledge of material. Schedule material for Bruno and order all of Bruno's material from Guin. Knowledge of production reports. Knowledge of PMCS, COMS, MDCS. Can do "material on shipping room floor" report. Can do cycle count inventory.[11]

In Kerr's 1994 application, she listed her qualifications as follows:

> Have worked with schedulers and know types material. Have 29 years work experience. Knowledge of computers. Work well with people. Knowledge of PMCS, MDCS & CASS. Experience in charging off materials. Good safety record. Good telephone communications. Good telephone communication with St. Paul people. Will[ing] to work overtime.

Northington gave the following as her qualifications in 1993:

> 1-Good communications
> 2-Willing to work overtime
> 3-Works closely with schedulers
> 4-Familiar with SIA Accounts
> 5-Familiar with all Systems-MDCS, COMS, PMCS, CASS[12]

<u>*Russell's impression sheet evaluations of Kerr and Northington*</u>[13]

---

[11] Kerr was offered, but, for personal reasons, did not accept, the scheduler's job in 1993.

[12] The plaintiff points out that neither Northington nor Kerr had any computer degree or formal education beyond high school.

[13] Only Russell's evaluations of Northington and Kerr were submitted.

Russell wrote of Kerr in 1993: "28 years of experience. Attention to her responsibilities. Highly qualified. Positive outlook on the future of Guin Plant." In the 1994 evaluation of Kerr, Russell wrote: "Carolyn is an outstanding candidate for [illegible]. She fits the criteria [illegible] as she did when she was offered a scheduler job in 93." Of Northington in 1993, Russell stated: "21 years exp. In order dept. confident of her abilities. Well qualified." Northington's and Kerr's years of experience were in the order department. Russell rated Northington and Kerr "qualified" in every category.

*Contents of impression sheets*

The list of duties, responsibilities, and skills set out in the 1993 and 1994 impression sheets are identical with each other and are on the whole the same as the duties set out in the 1997 list. The 1997 impression sheet includes all of the computer requirements stated in the 1993 and 1994 impressions. The 1997 sheet, however, adds the following: Pirates, MDCS, and software packages (Excel, MS Word, or WordPerfect.)

WHETHER THE PLAINTIFF WAS QUALIFIED

*Plaintiff's description of her job*

The duties the plaintiff performed in the orders department constitute a statement of some of her skills. She stated that her job :

> [w]as to give the job ticket to the scheduler, who would in turn write whatever they needed to write on the ticket to get it cut. The scheduler would then return this back to Joneta and she would do whatever she needed to do to complete the task.

*Plaintiff's Brief*, p. 3; *Plaintiff's Deposition*, p. 63.

*Plaintiff's 1997 interest application*

The plaintiff's 1997 statement contains her job duties in the orders department as well as other information which she thinks helped to qualify her for the job of scheduler.

> I am best qualified for the position of scheduler because in my present position I prepare the orders for shipping and the information I use comes from job tickets; therefore I am familiar with information on the job tickets, dates and routing of orders. I also know about the different products we manufacture. I work with different systems used by the schedulers and systems used to process orders. The systems are as follows: Pirates, Cass, Coms, MDCS and CPQL. Knowledge of these systems are important in the preparation of orders for shipping. Education [sic]: I graduated from Hubbertville High School in 1972. I graduated from Stillman College in 1976; I received my B.A. in English. I've taken classes [sic] to help me understand the production process better and to enhance [sic] my work skills. The classes are as follows: Lotus 1, 2, 3, excel, GMS and APIC. I have attached letters of references/letter to help explain more about my qualifications and my work relationship with others throughout the company.

By 1997, the plaintiff had worked for 3M for 20 years.

*Plaintiff's scheduling experience*

The plaintiff testified in her deposition that she had done scheduling for Bruno's for about six months while at 3M.

The plaintiff's computer history is not exactly clear.[14] Although the plaintiff lists Excel and Lotus 1, 2, and 3 in her *1997* application, she testified in her deposition that she acquired these skills in *1998*, along with Microsoft Word and Power Point. *Plaintiff's Deposition*, pp. 37-39.[15] It at first seemed that this time contradiction might be explained by one of Spann's statements in his impression sheet, which was that the plaintiff *started* the Excel class but the instructor asked for permission to dismiss her from the class and the plaintiff dropped out. Therefore, it might have been that in 1997 the plaintiff meant that she had merely *taken* classes in Excel but did not finish the course; however, the plaintiff also testified in her deposition that she had not taken *any* Excel and Lotus classes before 1998. Thus, it is not clear whether these particular computer skills were acquired before or after the plaintiff applied for the scheduler job in 1997. In any event, it seems clear that the plaintiff was able to use CASS in 1997, which Lindley stated was the

---

[14]Any skills the plaintiff acquired after the time of her 1997 application would be irrelevant. By the same token, any problems Lindley had performing the scheduler's job cannot be considered. The defendant's actions must be judged on the circumstances which existed at the time of selection.

[15] The plaintiff did not mention Microsoft or Power Point at all in her application.

computer skill most used by a scheduler.[16]

*Impression sheet evaluations of the plaintiff*

Gordon, Spann, and Russell evaluated the plaintiff as follows.

Lynn Gordon

| Comment | Rating |
|---|---|
| # 1: Has experience in order processing and some inventory control with Bruno." | Low Qualified |
| #2: Works with orders daily. Work record indicates problems with accuracy, following detailed instructions. | High Borderline |
| #3: Has worked with various groups in the plant. Served on 24 hour service team. MD's implementation, CPL implementation. Frequent work with CSR's. | Low Qualified |
| #4: Collected and forwarded data for the 24 hour service team. Some information gaps occur[r]ed. | High Borderline |
| #5: Experienced in CDMS. Exposure to figures. Inquiry into CASS. Exposure to PMCS. Has used EXCEL to create graphs. | Low Qualified |
| #6: BA in English, work | |

[16] It is not known whether CASS was used as much at the time in question as when Lindley made this statement in her March 3, 1999 deposition.

| | |
|---|---|
| experience in order services, data entry. APCS exposure. | Middle Qualified |
| #7: No comment. | |
| #8: Was willing to work "non-standard" hours such as 3rd shift, start time of 5 AM, etc. | Low Qualified |
| #9: Has had exposure to APICS | No rating |
| #10: No comment | No rating |
| Overall, is this person qualified to do the job? | Uncertain at this time |

Jerry Spann

| Comment | Rating |
|---|---|
| #1: Current Job Requires order processing skills with some inventory control awareness such as F/G releval. No scheduling or planning functions currently performed. | Low qualified |
| #2: Current job requires attention to detail of orders for certifications. | High borderline |
| #3: Current job requires a good amount of communication with same group, needs improvement. Co-worker relationship not adequate. | Low qualified |
| #4: Current job has led Joneta to serve on teams (24 hour service, system implementations team) Team Exp-did not present info properly. | |

Dept team effort lacked cooperation.

| | |
|---|---|
| | Low qualified |
| #5: Currently using PC with Windows recessing systems except GMS, some experience with Excel. Uses CASS, Pirates for inquiry only. Dropped out of Excel class. Instructor asked supv. to allow her to be dismissed from class. | High borderline. |
| #6: High school plus BA in English 20 yrs work experience at 3M order processing | Low qualified |
| #7: Attendance hrs. meet the 98% or ______, No accidents. No safety violations. | Middle qualified |
| #8: No comment | No rating |
| #9 Personal work references see attached. | No rating |
| #10: Goals/objections: To be a planner (MTL's Control). Management position | No rating |
| Overall, is this person qualified to do the job? | Uncertain at this time. |

Phillip Russell

| Comment | Rating |
|---|---|
| #1: exp. in all of it - Have not scheduled or planned nat'l order processor exp. included much of this. | Low qualified |

| | |
|---|---|
| #2: Special project to make items balance. | Low qualified |
| #3: J. says she enjoys communicating with other - good co-worker relation. Helps others when necessary. Client input ________ 24 hr. customer service action. | Low qualified |
| #4: Customer service reporting COMS | Low qualified |
| #5: Uses CASS daily | Low qualified |
| #6: BA in English. Taken Excel Lotus. Attended APIC classes | Low qualified |
| #7: J. states flexible in these area. | Low qualified |
| #8: Willing to work at any time & shift. | Low qualified |
| #9: No comment | No rating |
| #10: No comment | No rating |
| Overall, is this person qualified to the job? | Yes.[17] |

*Conclusion*

After consideration of all of the evidence cited by the parties relating to the

[17]Although it is not clear how a BA degree in English would help the plaintiff perform as a scheduler, the fact that the plaintiff had a college degree was noted by all three evaluators. All interviewers noted that Stidham had a BS degree in management, Starnes had one year of business college, and Gordon had eighteen months of business school. Spann stated that Cooper had an associates degree in secretarial training.

requirements of the job of scheduler, previously stated in this opinion and which will not be repeated here, and evidence cited by the parties but not stated in this opinion, it is concluded that there is at least evidence sufficient to create a factual issue as to whether the plaintiff was qualified for the job of scheduler when she applied for it in 1997. The plaintiff was competent in CASS. Russell concluded that the plaintiff was qualified to be a scheduler. Gordon rated the plaintiff qualified in five of the seven categories, including important category five, the computer category. Although Spann marked the plaintiff as borderline in the computer category, he rated her as qualified in five of the seven categories listed on the impression sheet. Gordon and Russell rated the plaintiff low qualified in category one, which contains, among other things, scheduling skills or duties, while Spann rated her middle qualified in this category.

## DEFENDANT'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR SELECTING LINDLEY/PRETEXT

Having determined that there is at least a factual issue as to whether the plaintiff was qualified for the scheduler's job in 1997, it is appropriate to focus on the qualifications of the other applicants, especially the person who got the job over the plaintiff. The following are the three evaluators' judgments on Lindley's qualifications as they recorded them on their interview impression sheets:

Lynn Gordon

| Comment | Rating |
| --- | --- |
| #1: Planning and experience in dealing with loads from converting and planning for shipments. Extensive experience handling orders. Some allocating on orders. | Low qualified |
| #2: Good background from label pre-processing. Currently has key instructions to follow on shipments, packing list details, etc. | Middle qualified |
| #3: Deals with all groups in the plant, truck lines, international export, etc. | Low qualified |
| #4: Serves on 24 hour service team. Served on shipping optimization team; CPL team; direct loading program Coordinates activities with converting, Order Dept. Shipping. | Middle qualified |
| #5: Has experience with COMS, CASS (some inquiry), PMLS, PIRATES (labels) MDCS, took EXCEL class. | Middle qualified |
| #6: High school degree with associate degree in computer service from Bevill. | Middle qualified |
| #7: No comment | No rating |
| #8: Was willing to work "non-standard" hours such as 3rd shift, start time at 5 AM, etc. | Low qualified |
| #9: No comment | No rating |
| #10: No comment | No rating |

| | |
|---|---|
| Overall, is this person qualified to do the job? | Yes. |

Jerry Spann

| Comments | Rating |
|---|---|
| #1: Current job requires planning & scheduling trucks as well as order processing functions. Some inventory control functions are performed with F/G allocations. Lots of product knowledge gained with labeling experience. Process knowledge while in production. | Middle qualified |
| #2: Current job requires attention to detail. History shows her to be very attentive to detail and accurate | High qualified |
| #3: Great communication skills and in current job. Communicates with truck lines, CSR's and Sales people. Served on focused factory teams. Job interest notice very well written and presented. | High qualified |
| #4: Co-worker relationship has been great. keeps supv and others well informed. Great team skills. No problem with confidential info. Coordination with other depts. has been excellent. | High qualified |
| #5: Degree in computer science with working experience on all systems except GMS. Uses software (label soft, Word Perfect). Has experience with all transportation systems and routing guides. | Middle qualified |

| | |
|---|---|
| #6: High school plus 2 yrs. associate degree in computers service. Haz MAT certified. 4 yrs. exp. in traffic. | Middle qualified |
| #7: Great attendance. Works as needed regardless of hrs of day. No safety violations or accidents | High qualified. |
| #8: No comment | No rating |
| #9: Goals/objections to move up as planner/ analyst. | No rating |
| #10: Work references M. Kelley | No rating |
| Overall, is this person qualified to do the job? | Yes |

Phillip Russell

| Comments | Rating |
|---|---|
| #1: Traffic job touches on all areas of product processing. Has been backup for scheduler | Low qualified |
| #2: Pre-processed all label info. Very _____ knowledge - i.e. N.C Special E.G. # | Low qualified |
| #3: Schedule pick up - contact carriers. Coordinates & _____ customers. Contributed on 24 hr. service team. | Middle qualified |
| #4: Learn system changes -- i.e., UPS problem solving | Middle qualified |
| #5: Worked with all of these. | |

| | |
|---|---|
| Detailed knowledge of Pirates since beginning. -- CASE also - MDCS daily. | Middle qualified |
| #6: Two yr. degree Computer Service. HAZ MAT certified. EXCEL classes. | Low qualified |
| #7: Flexible with hrs. Comes in when needed. | Middle qualified |
| #8: New way to do things & learning. Team Activities | Middle qualified |
| #9: No comment | No rating |
| #10: No comment | No rating |
| Overall, is this person qualified to do the job? | Yes |

The defendant states that Lindley was promoted over the other four applicants for the following three reasons: (1) all three interviewers thought Lindley was more qualified because of her extensive computer experience, (2) Lindley had prior scheduling experience, and (3) Lindley had a good employment record with 3M. *Defendant's Brief*, pg. 11. The following evidence pertains to those reasons, along with the impression sheets just set out.

*1. Superior computer experience*

Gordon's affidavit re Lindley:

> Following the interview process, Mr. Spann, Mr. Russell and I determined that Ms. Lindley was the most-qualified applicant, and we made the decision to award the job of Materials Control Scheduler to Ms. Lindley. Ms. Lindley possessed better computer skills than any of the other applicants. In fact, Ms. Lindley has a two-year associates degree in computer science. Because the vast majority of the Materials Control Scheduler job entails working with computers, we determined that Ms. Lindley was the most qualified. Additionally, Ms. Lindley had previous experience scheduling in transportation and had an excellent record of performance at 3M.

Spann's affidavit

> Following the interview process, Mr. Gordon, Mr. Russell, and I determined that Ms. Lindley was the most-qualified applicant, and we made the decision to award the job of Materials Control Scheduler to Ms. Lindley in June, 1997. I determined that Ms. Lindley possessed better computer skills than any of the other applicants. Ms. Lindley has a two-year associates degree in computer science and had helped establish some of the computer systems used at the Guin plant. Because the vast majority of the Materials Control Schedule job entails working with computers, we determined that Ms. Lindley was the most qualified. Additionally, I had supervised Ms. Lindley while she worked as an orders clerk and was quite pleased with her performance in that job.

Russell's affidavit:

> Following the interview process, Mr. Gordon, Mr. Russell, and I determined that Ms. Lindley was the most-qualified applicant, and we made the decision to award the job of Materials Control Scheduler to Ms. Lindley. Ms. Lindley possessed better computer skills than any of the other applicants. In fact, Ms. Lindley has a two-year associates degree in computer science. In addition, Ms. Lindley had previous experience scheduling.

Impression sheets on Lindley: Gordon rated Lindley as "middle qualified" in the computer category. He noted her experience with COMS, CASS, PMLS, Pirates, MDCS,

and that she had taken the Excel class. He rated her middle qualified in category five. Gordon stated in the formal education/work experience-in-material-control category, category six, that Lindley had a degree in computer sciences, and he rated her middle qualified in this category.

Spann recorded that Lindley had working experience in all systems except GMS. He also noted that Lindley used Software (Label Soft, WordPerfect) and that she was HAZ-MAT certified. He wrote in category five that Lindley had experience with all transportation systems and routing guides, and rated her middle qualified. In category six, Spann stated Lindley's associates degree in computer science, that she was HAZ-MAT certified, and that she had four years experience in traffic. Spann rated the plaintiff middle qualified in category six.

Russell wrote that Lindley worked with all of the computer programs or systems set out in category 5. In category six, he noted her associates degree, that she was HAZ MAT certified, pointed out that she had taken EXCEL classes, and rated her middle qualified in this category.

Lindley's 1997 interest application: Lindley stated that she held a two-year associates degree in computer science. She also had experience with COMS, FMS, Load Control, PMCS, CASS, MDCS.SCS, RRS, CIDS, CPL, SPSS, PIRATES, GFGRS, FMS,

FCS, and HPDESK.

Plaintiff's statements re her computer skills: The defendant references pages 36-39 and page 82 of the plaintiff's deposition. Those pages contain the following testimony. Several years ago the plaintiff took a computer course at a junior college, but she could not remember the name of the course. The plaintiff had taken some computer classes or courses at 3M. She named MicroSoft Word, Power Point, and Lotus.[18] She stated that in or around November, 1998, she took MicroSoft Word. Also in 1998, the plaintiff took classes and completed Lotus 1.2.3 and Excel. in 1998. The plaintiff's Power Point classes were not taken before 1998. As previously stated, however, in the *1997* application the plaintiff listed Excel and Lotus, 1, 2, and 3 as being among her computer skills. It will be construed, for purposes of summary judgment, that the plaintiff had knowledge of Excel and Lotus 1, 2, and 3 at the time she applied for the scheduler's job in 1997. The plaintiff also stated in her 1997 interest application that she had experience with Pirates, CASS, COMS, MCDS, CPQL, Lotus 1.2.3, Excel, GMS and APIC.

Computer skills of other three 1997 applicants: Although the defendant has not asserted that Lindley's computer skills were greater than the other three applicants, that comparison will be made.

[18] The plaintiff's testimony is not wholly clear. It appears that Power Point and Lotus are the same, and that Lotus 1.2.3 is Excel. *Plaintiff's Deposition*, pp. 36-39.

comparison will be made.

*Impression sheets/Interest applications*

Randal Stidham: Stidham said of himself, "PC, and preparing for certificate in APIC." Russell stated on the impression sheet that Stidham had "exp[osure] to most systems," and rated him as middle qualified in the computer category. Spann stated, "Currently using PC w/windows. Familiar with all systems listed. Some experience with software packages. Currently does not use CASS, MDCS, Pirates." Spann rated Stidham middle qualified in the computer category. Gordon wrote that Stidham had some "good PC skills, knowledge of COMS, PMCS, GMS," and rated him middle qualified.

Peggy Starnes: Starnes stated only that "3M offered courses at plant." Gordon wrote that she had exposure to PMCS/GMS several years ago, and rated her low-borderline in category five. Spann wrote: "Currently using PC w/windows. Familiar with some systems (PMCS,GMS)," and he rated her high-borderline. Russell wrote that Starnes "[m]ust be trained on some of these," and rated her low-qualified.

Donnie Cooper: Cooper stated that he had "working knowledge of Pirates, CASS, MDCS, COMS, PMCS, GMS, OPRA, CIAS, and OSOP." Russell noted only that Cooper was "Familiar with most of this," and rated him low-qualified. Spann

software experience. Great accounting background due to Cias OV___/Short Recon," and rated him middle-qualified. Gordon stated, "Some COMS, CASS experience. Much experience in PMCS,GMS, Pirates. No PC skills except some word processing." He rated Cooper high-borderline.

Comparison of computer skills: According to the plaintiff's interest application, she did not possess the following computer skills set out in category five of the impression sheets: PMCS, and Figures. Gordon, however, stated that the plaintiff had some exposure to PMCS. Although Gordon also stated that the plaintiff "uses Excel to create graphs," Spann recorded that the plaintiff "dropped out of Excel," apparently after the instructor, for some unknown reason, asked for permission to dismiss her.

With the possible exception of GMS, Lindley possessed all the computer skills or training the plaintiff had, plus the following: FMS, Load Control, PMCS, RRS, CIDS, SPSS, GFGRS, FCS, HPDESK. The plaintiff's post-high school formal education did not compare with Lindley's associates degree in computer. Although the plaintiff's BA in English might be helpful in certain areas, it clearly did not involve computer training.

The evaluators rated Lindley higher than Starnes and Cooper in computer. Although they gave Stidham the same middle-quality rating as Lindley, Lindley had more

computer skills or experience than Stidham.[19] Also, Lindsey was the only applicant with an associates degree in computer science.

*2. Prior scheduling experience*

Lindley had scheduling experience when she was promoted to scheduler. At the time of her promotion to scheduler, she was "advanced transportation coordinator," with experience in scheduling transportation. The Russell and Gordon affidavits point out the fact that Lindley had prior scheduling experience. The latter even stated that Lindley's performance record in scheduling was "excellent." He testified in his deposition, "Tina had had experience with scheduling loads, trucks, truck lines leaving the plant." *Gordon Deposition*, pg. 82. Spann stated in category one of the impression sheet that in her job as advanced transportation coordinator, Lindley was required to plan and schedule trucks. He also wrote in category six that Lindley had experience with all transportation systems and routing guides, she was HazMAT certified, and she had four years experience in traffic.[20]

The *plaintiff* testified that at the time in question she had scheduled for Bruno's for

[19] Stidham did not use CASS, PMCS, Pirates.

[20] There is some overlapping among the categories.

six months. Spann wrote in the impression sheet that *currently* the plaintiff had no scheduling or planning functions. Russell stated that the plaintiff had not scheduled or planned "mat'l." Gordon did not note any "scheduling" experience, but stated in category one that Ricks had some inventory control experience with the Bruno account. Apparently Stidham, Starnes, and Cooper had little, if any, prior scheduling experience.

3. *Employment record*

The defendant states that Lindley's performance record was a basis for her selection. Spann stated in the impression sheet that Lindley's current job required attention to detail, and that her history showed that she was accurate and very attentive to detail. He also stated that Lindley had great communication skills which she used in her current job. She had great team skills, and she communicated with truck lines, CSR's, and sales people. She also served on focused factory teams. Lindley had great relationships with her co-workers. She kept her supervisor and others well-informed. She kept confidential information confidential. Lindley had a great attendance record, worked the hours she was needed, and had no safety violations or accidents. Russell likewise recognized Lindley's very detailed knowledge and her willingness to work flexible hours. Gordon noted that Lindley dealt with all groups in the plant, truck lines,

and international export [sic]. In Spann's deposition, he stated that he had supervised Lindley when she was an orders clerk and was "quite pleased with her performance."

As to positions held and promotions, Lindley was hired at the 3M plant as a "mogul operator." In her deposition, Lindley stated that after four months she "worked in the order department. Well, actually, it was the traffic department." *Lindley's Deposition*, pg. 34. The job title was "advanced orders clerk." *Id.* at 35. As "advanced orders clerk," Lindley used her "computer skills." *Id.* at 36.

In their impression sheets as to the plaintiff, however, Gordon and Spann expressed some negatives. They stated that she had problems with accuracy and in following detailed instructions. As an example, Gordon stated that there were informational gaps in the data the plaintiff collected and forwarded to the 24-hours service team. Spann stated that the plaintiff's relationships with co-workers were inadequate. On the other hand, it was noted that the plaintiff had a ninety-eight per cent attendance record and no accidents or safety violations. As previously stated, in February of 1986 the plaintiff was promoted from order records clerk to advanced orders record clerk, and in April of 1994 she was promoted to senior order services clerk.

*Pretext*

The plaintiff states that the defendant's reasons for selecting Lindley over the plaintiff are mere pretext for denying the plaintiff the scheduler's job and giving it to Lindley instead. The plaintiff states that Lindley had less than five years experience in the plant, and she had no experience in the order department. The plaintiff points to letters of reference to show that she was more qualified than Lindley.[21] The plaintiff states that Kerr and Northington had no trouble working with her -- Kerr testified that she trained the plaintiff to do scheduling work for Bruno's and had no problems training her --- but they had numerous problems with Lindley's work as scheduler. The plaintiff states that she was familiar with the computer systems used in scheduling.[22]

*Conclusion*

In a recent case, the Eleventh Circuit discussed the sufficiency of pretext evidence in a case where the employer's reason for awarding a job to someone other than the plaintiff was that the other person was more qualified. The court stated:

> In a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted. A plaintiff must show not merely that the defendant's

---

[21] Those letters of reference cannot be found in the plaintiff's submissions. In light of the fact that the evaluators had the plaintiff's statement of her qualifications and knew her work record, such letters would have little if any probative value.

[22] The plaintiff states that any computer shortcomings she had was the fault of the defendant for not training her. However, there is no claim that the plaintiff was not trained because of discrimination.

employment decisions were mistaken but that they were in fact motivated by sex. *See Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir.2000). We have explained that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997), cert. denied, sub nom., *Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); see also *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999), cert. denied, --- U.S. ----, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir.1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position.... The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination."

Nevertheless, evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting the plaintiff was pretextual. *See Alexander*, 207 F.3d at 1340; see also *Walker v. Mortham*, 158 F.3d 1177, 1190 (11th Cir.1998), cert. denied, --- U.S. ----, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999)(" 'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination' ") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258-59, 101 S.Ct. 1089, 1096-97, 67 L.Ed.2d 207 (1981)); see also Taylor, 175 F.3d at 868 *1254 (stating that evidence of plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when it promoted him).

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County*, 207 F.3d at 1340. In *Deines*, for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase "jump off the page and slap [you] in the face" ... should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary

> burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact.
> Id. at 280-81.
>
> The Tenth Circuit in *Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321 (10th Cir.), cert. denied, --- U.S. ----, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999), articulated a similar evidentiary burden for proving pretext. The court explained that "an employee's own opinions about his ... qualifications [do not] give rise to a material factual dispute.... When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Id.* at 1329-30 (internal quotations and citations omitted). The court emphasized that its "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments." *Id.* at 1330.

*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-1254 (11th Cir. 2000). The court held against the plaintiff, as "[n]one of Lee's proffered evidence established that she was more qualified than Hines, let alone so clearly more qualified for the position than Hines that a reasonable juror could infer discriminatory intent from the comparison." *Id.* at 1255.

Plaintiff Joneta Ricks asserts that the qualifications for scheduler have not changed since 1994, and that in 1997 she was as qualified as Kerr and Northington when they were awarded their scheduler jobs. Even if the plaintiff's contention that the qualifications for scheduler have not changed since 1994 is true, there is no inconsistency in the actions of Russell, who rated Northington and Kerr qualified to be schedulers, because in 1997 Russell evaluated the plaintiff as qualified overall to be a scheduler. Moreover, the plaintiff did not compete against Kerr and Northington in 1997, and Kerr and

Northington did not compete against Lindley in 1993 or 1994. It is critically important that the evaluators clearly emphasized the role of the computer in the scheduler's job. Gordon stated that ninety per cent of the scheduler's job involves the computer. The 1997 impression sheets specified more computer programs than the 1994 impression sheets. Added were Pirates, MDCS, and software packages (Excel, MS Word, or WordPerfect). Thus, Lindley's two-year associates degree in computer separated her from the plaintiff and the other three applicants. Lindley also had the practical computer experience of helping establish some of the systems used at 3M. Neither the plaintiff nor any of the other three applicants in 1997 had such experience. Also, Lindley was proficient in more computer programs than the plaintiff or any of the other applicants, as set out, *supra.* The three evaluators also were impressed with Lindley's scheduling experience and her employment record, and there is no evidence that there is anything bogus about such assertions. Even Russell, who found the plaintiff qualified for the job, thought that Lindley was the best choice of the five applicants. The evaluators also decided that Lindley was more qualified than the other three white applicants who were also passed over. As to the plaintiff's pointing out evidence that Lindley's performance after she became scheduler was poor, even if this is true, it is irrelevant, for Gordon, Spann, and Russell's selection of Lindley must be judged according to the circumstances

which existed at the time they made their selection.[23] It is concluded as a matter of law that there is insufficient evidence of pretext to support a finding that Lindley was not selected because of her qualifications, but because the plaintiff is black.

Wherefore, the defendant's motion for summary judgment on the promotion claim is due to be granted and that claim is due to be dismissed. An order in accordance with this memorandum opinion will be entered. Disposition of the defendant's motion for summary judgment on the firing and retaliation claims will be addressed at a later time.

DONE this 14th day of May, 2001.

Robert R. Armstrong, Jr.
United States Magistrate Judge

---

[23] With respect to the plaintiff's pointing to acts indicating racial bias --- for example, racist graffiti --- such evidence is likewise irrelevant, as they are not connected to the decision of Gordon, Spann, and Russell to award the scheduler's job to Lindley.