# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

01 OCT 25  AM 9:21

JONETA RICKS,                 )
                              )
    Plaintiff,          )
                              )
vs.                           )          CV-98-RRA-1463-S
                              )          CV-00-RRA-0560-S
MINNESOTA MINING AND          )
MANUFACTURING,                )
                              )
    Defendant.          )

**ENTERED**

**OCT 2 6 2001**

## MEMORANDUM OPINION

The plaintiff applied for the job of materials control scheduler. When the job was awarded to someone else, she filed a complaint with the EEOC on June 16, 1997, alleging race discrimination. The EEOC found her claim to be without merit. On June 8, 1998, the plaintiff filed a lawsuit in this court, CV-98-RRA-1463-S. The defendant filed a motion for summary judgment. The court granted that motion and dismissed the plaintiff's promotion claim.[1] Before the court now is the defendant's motion for summary judgment on the plaintiff's claims set out in the second lawsuit, CV-00-RRA-0560-S, which was filed March 6, 2000.

---

[1]The plaintiff appealed. The appeal was dismissed, however, as the judgment was not final, in that not all of the issues in this consolidated action were ruled on.

Lynn Gordon and Marguerite Kelley recommended that Ricks' position with the defendant be terminated. Their recommendation was sent to Ron Schalk, the plant manager. Schalk decided that the plaintiff should be dismissed. His decision was reviewed and approved by the division human resources manager and other management personnel in St. Paul, Minnesota. The plaintiff contends that she was fired and harassed in retaliation for having filed the EEOC complaint and the first lawsuit. She also contends that she was fired and harassed because of her race. She states in her complaint:

> At the time of the plaintiff's termination, she was the only African American employee in this particular division of the 3M plant. Prior to her termination, the defendants interfered with her ability to perform her work, and provided a hostile work environment toward her, not only due to her race, but also due to the fact that she had a pending claim for discrimination against 3M and all of the employees that closely worked with Ms. Ricks were involved by way of discovery or otherwise in regard to this claim for discrimination.

*Complaint*, ¶7, CV-00-RRA-0560-S. The defendant asserts that the plaintiff was dismissed because of her (1) insubordination, (2) disruptive behavior, and (3) harassment of co-workers. The court's decision on the current summary judgment motion is based upon the evidence pointed out and relied upon by the parties. The material facts are set out as follows.

-2-

### March 10 Meeting with Jerry Spann

On March 4, 1999, the plaintiff's performance for the previous year was evaluated by Jerry Spann, the plaintiff's supervisor. On March 10, 1999, the plaintiff met with Spann to discuss the evaluation. In his sworn statements, Spann recounts his conversation with the plaintiff. The plaintiff asked why she was not on the Y2K committee, and Spann replied that he was the department representative on that committee. The plaintiff then told Spann that she knew more about business systems than he did. She also told him that he did not know enough about what was going on in the department to be  supervisor. The plaintiff disputes that she told Spann that she knew more about the business system than he did, that she told him that she knew more than he did, or that he did not know enough to be supervisor.

In support of Spann's statements, the defendant points to the plaintiff's own notes of what was said during that meeting.  Concerning the Y2K conversation, the plaintiff's notes, in which the initials "JR"stands for the plaintiff, contain the following:

> J.R. No I did not and Jerry knows that's not true.  I asked Jerry about the Y2K
> Team. ~~he~~
> ~~L.G. I asked if I could be (illegible)~~ He
> ~~L.G. Well what about the incident yesterday~~
> ~~LG~~ Said 'I'm on that team and represent the department.' ~~I said Jerry L. Gordon~~
> Why should [sic] want to be on the team when you don't know all the systems
> and I do."

The plaintiff testified that the last sentence was uttered by Spann.

If the word "you" is inserted into the last sentence, so that it reads, "Why should *you* want to be on the team when you don't know all the systems and I do," that sentence could sensibly have been made by Spann, even though the plaintiff did not put this sentence in quotation marks as she did the sentence immediately preceding it, which clearly was spoken by Spann: "'I'm on that team and represent the department.'" Also, an obvious lack of accuracy is that, if none of the "cross-throughs" are considered, the only designated speaker is "JR;" certainly not all of the statements were made by the plaintiff because the statement, "I'm on that team and represent the department," was clearly made by Spann.  Further, the plaintiff in sworn statements has stated that she made mistakes in designating the speakers. Thus, there is a factual issue as to whether the plaintiff told Spann that she was better qualified than he was.


## Plaintiff's March 11 Meeting with Spann/the CASS Reports

On March 11, 1999, the plaintiff brought Spann certain portions of a CASS report on which Tina Lindley had made entries. The plaintiff pointed out to Spann what she considered were errors in those entries.  Spann told the plaintiff, however, that what she

believed were errors in the allocation dates were actually the system's re-use of the same

order number in two different calendar years for two completely different orders. Spann

further pointed out that if the plaintiff had simply reviewed the screen she would have

seen that the prior order with the same number was shown as having been deleted.

Because it was Lindley's job, not the plaintiff's, to correct business systems errors, Spann

told the plaintiff to give the reports to Lindley. The plaintiff, however, told Spann that

she was going to correct the errors. According to the defendant's evidence, three times

during the course of this explanation the plaintiff tried to grab the reports out of Spann's

hands.

The plaintiff then proceeded to Lindley's work station. The plaintiff told Lindley

that she was going to contact the systems analyst about making the corrections. Spann

heard the plaintiff make these statements and asked her if she understood his instructions

to give the reports to Lindley. The plaintiff responded by telling Spann that she was

talking to Lindley, not him. The plaintiff further told Spann that she and Lindley were

talking about something else. Spann again told the plaintiff to give the orders to Lindley.

After writing something down, the plaintiff obeyed Spann's instruction. However, the

plaintiff then asked Lindley if she had not seen that the reports had wrong dates on them

-5-

when Lindley allocated them, and the plaintiff again stated that she was going to call the business analyst.

### Plaintiff's March 12 Meeting with Gordon

Spann reported the plaintiff's actions to Lynn Gordon, who met with the plaintiff and Spann on March 12, 1999.  Gordon was the plaintiff's manager at the time, and Spann's supervisor.  In this meeting, the plaintiff told Gordon that she had not tried to snatch the documents out of Spann's hands.  She admitted, however, that Spann had explained the entries as he stated he did and that he told her to let Lindley handle any corrections that needed to be made.

### March 12 COMS Exception Report

On March 12, the plaintiff gave Carolyn Kerr and Wanda Northington a COMS exception report.  The plaintiff showed Kerr and Northington where she had marked orders as not allocated.  Although noting the dates that orders were filled was not part of the plaintiff's job, she nevertheless marked the report as showing that orders were not filled on time because in fact they had not been shipped on the dates indicated.  Although

it was true that some orders had not been sent out on the dates indicated, the report was not incorrect on that account; Spann, as supervisor, had instituted a two-day grace period for shipping, for the reason that often orders could not be filled for shipment the same day orders were received.

When Kerr, who did have shipping responsibilities, pointed out to the plaintiff that the plaintiff's notations on the report were contrary to the procedure established by Spann, the plaintiff responded that things were changing. Kerr, however, determined to comply with procedure, returned the report to the plaintiff, only to have the plaintiff come back with the report and again request that Kerr redate it.

### March 12 Meeting With Gordon

When questioned later that day by Gordon, Ricks did not deny her behavior about the report, as above stated. Gordon also discussed with her the events of March 10 and March 11. Gordon told Ricks that she would receive a written warning for insubordination for the events of March 10, 11, and 12, 1999.

## Events Following the March 12, 1999 Meeting with Gordon

The defendant's evidence shows the following occurred on March 12 following the meeting with Gordon. The plaintiff returned to her general work area and began talking to Tina Lindley in a loud voice. The plaintiff slammed file drawers, clapped her hands, slapped her desk, stomped her feet, laughed loudly, and loudly called out "Jesus" several times. Spann told the plaintiff to be quiet. The plaintiff informed Spann that she had constitutional rights and one of them was freedom of speech. (The plaintiff testified in her deposition that she was very stressed and thought she was having a heart attack. She did not, however, ask for medical assistance.) Spann then told the plaintiff that her behavior was inappropriate, to get her things and go home. The plaintiff, however, refused to leave, stating that she had work to do. Spann then told Ricks to see Marguerite Kelley, the human resource manager. Kelley sent the plaintiff home on a disciplinary suspension.

## Kelley-Gordon Investigation

Kelley and Gordon conducted an investigation. They talked to numerous employees, including employees who were not a part of the plaintiff's department. Kelley

and Gordon were informed of or were  involved in the following. All five of the

complaining witnesses --- Lindley, Davis, Wooldridge, Kerr, and Spann --- reported that

the plaintiff acted as stated above.  Kelley and Gordon were also informed that, as a result

of the plaintiff's episode following her March 12 meeting with Gordon, Lindley and Davis

left the area to get away from Ricks, and Don Wooldridge went home as soon as he could

to get away from her.  Additionally, on March 11, 1999, Kerr reported to Spann that

Ricks had intentionally blocked her path with a file drawer and followed her through the

department, laughing at Kerr as Kerr left. Kerr had complained to Gordon about Ricks'

continued harassment, specifically mentioning Ricks' demands that Kerr re-date the

COMS exception report in violation of the procedure established by Jerry Spann.  Kerr

even stated that if the supervisors in the Guin plant could do nothing about the plaintiff's

actions, she would call the offices in St. Paul.

Kelley and Gordon made credibility findings.  They noted that the statements of

the complaining witnesses were consistent with each other, and that the accounts of the

complaining witnesses were corroborated by other employees.  Kelley and Gordon

concluded that the complaints about the plaintiff were true. Gordon and Kelley pointed

out that the plaintiff had been reported as insubordinate and disruptive only recently.

(On May 28, 1992, the plaintiff received a written warning for an inappropriate display of disruptive behavior.)[2]

## March 15 Meeting

On March 15, 1999, Kelley and Gordon met with Ricks to talk to her about the harassment charges made against her by her co-workers.  Ricks for the first time stated that she felt that she was being harassed.  However, she said nothing more specific than that she had a general feeling that she didn't know if any of her co-workers were members of the Klan.  In her deposition Ricks testified that she told Gordon: "Matter of fact, I told Lynn and them I was afraid because I didn't know who in that room was a member of the Ku Klux Klan and I didn't know who in that room had members of the Ku Klux Klan in the family.  I was the one that should be afraid and I was afraid." *Defendant's Evidentiary Submission*, Exhibit "G," *Plaintiff's Deposition*, p. 140.  The plaintiff was also questioned about some of her notes she made of her meeting with Kelley and Gordon.  Those notes state, in part:

---

[2]On October 5, 1981, the plaintiff received a disciplinary suspension with pay for lack of productivity.  On March 31, 1993, the plaintiff received a written warning and was placed on a formal performance correction plan for her repeated failure to complete her work on time.

Recently I have been harassed by Wanda, Carolyn, Tina, Jerry Span. I feel like I have nobody in the, "looks like department abbreviated," I can talk to. Tried to talk to Sandra this morning and she wouldn't talk. W and C have retaliated against me since they went to B'ham [and gave their depositions in the first lawsuit]. Tina has come over and talked to me about her husband.Jerry has told me things that are not true but I have no witnesses. I fear for my life. W, C and T there's tension. I'm scared, Sandra, I think she just doesn't want to get in the middle of something. Being black I'm scared, I don't know whose family is in the Klan. I am scared. My family knows this and my church knows this. I have nothing against you (L and M), but I have civil rights.

And then, "LG: No reason to be afraid. If you have a situation you're scared of, tell me, Ron, Bob Cox. This the first I've heard about it.

*Id.* at 159-60.

## Kelley and Gordon's Recommendation

After completing their investigation, according to company policy, Kelley and Gordon concurred that the plaintiff's employment should be terminated for the three incidents of insubordination for which she was warned on March 12, 1999; her disruptive behavior of March 12; and her harassment of her fellow workers. The plaintiff's complaint of harassment was not investigated because it was not amenable to investigation. It was a general assertion only, lacking in facts. Also, Kelley noted that the plaintiff did not complain of harassment until she was confronted with charges of her own improper behavior.

Gordon's affidavit demonstrates the thoroughness of the investigations.

-11-

I determined that Ms. Ricks had been insubordinate for the second day in a row based upon my investigation of events of March 11, 1999; in reaching this conclusion, I followed the procedure for conducting an investigation and gave no consideration to Ms. Ricks' race, sex, or prior complaints, suits or charges, and never heard anyone else say anything or do anything leading me to the conclusion that race, sex, or past charges or complaints played any role in the decision.

     a.     I followed the investigation procedure outlined in 9., above when I determined that Ms. Ricks had been insubordinate to supervisor Spann on March 11, 1999; I attach hereto as Attachment 3 my notes of my investigation of Ricks' insubordination toward her supervisor on March 11, 1999. Also, my notes previously attached hereto as Attachment 2 discuss this incident. In addition to my notes, I also reviewed the old orders that Ricks' supervisor, Jerry Spann, was reviewing with her at the time of her insubordinate conduct, as well as Spann's account of the incident. Also, I met with Ricks and Spann regarding this incident.

     b.     Based upon my review of information set forth in 11.a., and after discussing my conclusion with Marguerite Kelley, I concluded that Ms. Ricks was guilty of violating 3M's insubordination policy.

     c.     Based upon the information set forth in 11.a. and b. above, I determined that on March 11, 1999, Ricks was insubordinate in her handling of an issue regarding a computer record of old orders that was the responsibility of another employee, Tina Lindley; specifically:

         (1)     Ricks went into Spann's office and handed him some order printouts which Ricks claimed were erroneous. As Spann was reviewing the reports and attempting to explain to Ricks that the reports did not contain the errors she claimed they contained, Ricks tried three times to grab the repots out of his hand, even though Spann asked her to wait until he was finished looking at them.

         (2)     Spann explained to Ricks that what she believed was an error in the allocation date on the part of an employee was in fact the system's re-use of the same order number in two different calendar years for two completely different orders, and that if she simply reviewed the screens she could see that the prior order with the same number was shown as having been deleted.

         (3)     As it was Lindley's job, not Ricks', to rectify any business systems errors, Spann told Ricks to give the reports to Lindley. However, while leaving Spann's office, Ricks said that she was going to correct the "errors" and then told Lindley that she (Ricks) was going to have the report corrected herself by contacting system analyst, Carol Arnold.

(4)     Spann heard these statements by Ricks and asked her if she had misunderstood what he just told her to do (give the reports to Lindley). Ricks said, "What?" and then told Spann that she was talking to Lindley not him, and that they were talking about something else.

(5)     Spann again told Ricks to give the orders to Lindley, whereupon Ricks started writing something down. After being told twice, Ricks gave the reports to Lindley and said to her, "Did you not see this had the wrong date on it when you allocated it?" By this statement, Ricks indicated that she had rejected Spann's explanation that the reports were not erroneous.

(6)     Tina Lindley reported to Spann that, after Spann left Ricks' area, Ricks said that she was going to call the business analyst.

(7)     Spann reported these remarks to me.

d.  In my meeting with Ricks and Spann regarding this incident, Ricks denied trying to snatch the documents out of Spann's hand, and insisted that she was handling the issue professionally with Tina Lindley when Spann walked up; however, I concluded that the events happened as Spann said they did. I reached this conclusion based upon the points at which the two accounts agreed (Ricks admitted that she went into Spann's office with a document that she thought contained an error instead of asking the employee involved about it, Ricks admitted that she did not understand how the system worked, and that Spann gave the explanation and direction to let Tina Lindley handle it that he says he gave, and Ricks conceded that she was talking to Ms. Lindley when Spann walked up), upon the fact that other employees (Tina Lindley and Sandra Davis) confirmed Spann's account on the points where Ricks' and Spann's accounts differed, upon Ricks' and Spann's past disciplinary record and behavior in my presence (I have seen Ms. Ricks, but not Mr. Spann, become disruptive in the past, and her file, but not his, reflects past discipline for such behavior), and upon my interview with employees concerning the facts (Spann's, Lindley's, and Davis's version seemed more probable in light of Ms. Ricks' past behavior toward Mr. Spann and Ms. Lindley).

*Defendant's Evidentiary Submissions,* Gordon Affidavit, pp. 6-9.

## Plaintiff's Argument

In her brief, the plaintiff points out a few additional facts, and contends that in March of 1999 she was "fed to the wolves."

### Evaluations of other employees

The plaintiff states that other employees did not receive unfair evaluations.

### Northington, Kerr, and Lindley stopped talking

On March 3, 1999, the depositions of Northington, Kerr, and Lindley were taken as part of discovery in the plaintiff's promotion discrimination lawsuit. After their depositions, Northington, Kerr, and Lindley stopped talking to the plaintiff.

### Doing her job

The plaintiff was not being insubordinate or disruptive on March 11 and 12. She was just doing her job. She testified in her deposition that she wanted to point out errors made by Roger and Randall to show that she was not the only one who made mistakes.

No offer of medical care

Thinking she was about to be fired, she laughed to relieve her stress, preferring laughter to tears. Her supervisors, however, did not get her medical care.

Letters of recommendation

The plaintiff states that "she had the support and recommendation of other 3M employees who considered her performance as an employee to be outstanding." *Plaintiff's Brief*, p. 9. The plaintiff obtained, apparently in connection with her attempts to get promoted, letters from several customer service representatives. The letters were complimentary, including statements of the plaintiff's pleasantness, cooperation, helpfulness. She was said to be "a team player."

Not allowed to have a witness

When she was interviewed on those March 11 and 12, the plaintiff was not allowed to have a witness.

Other employees did the same things but were not reprimanded

-15-

The plaintiff points to one of her exhibits which contain copies of several notes.

They are dated March 23, 1998. The author is unknown. The following note is

representative.

> 3/23/98 The Nurse Renfroe, D. Wooldridge , P. [unintelligible], C. Kerr. 7:59
> A.M. When I walked into the office the above people were laughing and talking.
> Lynn Renfroe was telling something funny. D. Wooldridge was [pivoting] his
> chair back and forth and making a tapping sound with his feet. He was making a
> funny sound as he laughed. Lynn was talking loudly. Jerry was in his office on
> the phone. I could hear him.

*Plaintiff's Evidentiary Submission,* Exhibit NN.


## Termination simply unfair, excessive

The plaintiff points out the defendant's Guide to Conduct, which states:


> All 3M employees share responsibility for keeping the 3M workplace safe, efficient
> and orderly. In order to accomplish this, certain employer expectations are
> necessary. This GUIDE outlines some of the work habits and work rules that
> experience has shown effective in maintaining a productive work environment.
> When an employee's conduct is unacceptable, corrective and/or disciplinary
> action may be required. It is the practice of 3M before taking action to examine
> each case individually, considering, among other things, the nature of the conduct
> as well as the past record and service of the employee involved. Be sure you know
> the guidelines and what 3M expects of you. Your good judgement and willingness
> to cooperate will do the rest.


*Defendant's Evidentiary Submissions,* Exhibit C, *Kelley Affidavit,* attachment 6.

-16-

The plaintiff states that she had done worse things in the past, but had never received such harsh punishment.[3] She had given the defendant dedicated work for almost twenty three years. The plaintiff further states that she "knew of no other person who had worked in 3M offices as long as she had and had been fired." *Plaintiff's Brief,* p. 12. The plaintiff received raises every year, and received promotions in 1986 and 1994. She also was given good marks on previous evaluations. Therefore, "there is strong evidence her history and record were not considered when 3M fired her over events that occurred in a two-day period." *Id.* at 11.

## Contradiction in co-workers statements of harassment

The plaintiff asserts that her co-workers' statements that she harassed them is in contradiction to what they stated in their depositions taken only nine days before the plaintiff's alleged disruptive behavior. The depositions referenced by the plaintiff are those of Gordon, Kerr, Northington, and Lindley. Gordon, Kerr, and Northington testified

---

[3]The plaintiff then refers to the March 10, 1999 evaluation and states that she "received a similar rebuke as she had in the past from Jerry Spann." It appears, however, that Spann made the following comment: "Joneta has played a role in the order filing and direct loading process as implemented and its evolution to current status. She has supported customer service well with the performance of her duties. She served on an opinion survey team during 1998." (Spann had given the plaintiff several good evaluations.) It further appears that Gordon stated "Joneta's contribution in a very tough business year is very much appreciated.

-17-

that they had no problems with the plaintiff's work, although Kerr also said that sometimes the plaintiff gets very angry. Lindley simply stated that she did not have any problems with the plaintiff.

Kelley's credibility is in issue

Kelley signed an affidavit consisting of twenty pages of details concerning the plaintiff's improper behavior. The plaintiff points out, however, that at Kelley's deposition, taken only twenty-eight days before, she could not remember details. The plaintiff points to a few lines of testimony in which Kelley was asked about the statements of the plaintiff's co-workers she looked at.

The deposition shows that when Kelley was asked what she could remember, she replied that she could recall if she were allowed to look at the statements. Counsel continued to question Kelley without letting her see the statements, and Kelley continued to answer that she could not remember or that she needed to refer to her notes.

The plaintiff states that "Kelley is one of the primary culprits here because she had been reprimanded by 3M for placing 'black male' or 'black female' on applications." The plaintiff refers to Sandy Bryant's telephone deposition, Exhibit "C" pp. 17-18. Bryant

indicated that such designations had already been brought to his attention, and that 3M had taken steps to advise Marguerite Kelley that such designations were inappropriate. Kelley had explained that the designations were used to assist in developing their applicant flow log.   Kelley stopped this practice when instructed that it was nonetheless inappropriate. This took place in September of 1993.

The plaintiff further states that there is nothing on file showing that Kelley ever investigated any of the plaintiff's claims of harassment, even though such claims dated back to 1981.  The plaintiff, however, does not reference any evidence in support of this statement.

Thus, the plaintiff argues, having Kelley as the person responsible for investigating the complaints made against the plaintiff and deciding upon the plaintiff's punishment was equivalent to having the "fox guarding the henhouse."


Evidence of racism

The plaintiff admits in her brief that she testified that there were no specific racial remarks by specific managers in her presence.  However, the defendant was well aware of racism in the plant.  One source of such knowledge was a letter from the NAACP.

According to the plaintiff, the defendant failed to act on this complaint. The plaintiff

points to Sandy Bryant's testimony that he would expect someone to respond to racial

complaints from the NAACP.

The plaintiff contends that "3M was willing to investigate the complaints by the

Caucasian co-employees of Joneta and determine that Joneta was in fact guilty of

harassment which led to her termination, but no investigation was performed relating to

any of the complaints made by Joneta in regard to racial discrimination against African

Americans. *Plaintiff's Brief*, p. 15.

## Conclusion

The plaintiff's argument concludes: "Joneta has been discriminated against because

of her race, she has been harassed because of her race, and she has been harassed and

intimidated by her supervisors and co-workers because she filed her initial lawsuit."

*Plaintiff's Brief*, pg. 16-17.

## Law

## Direct v. Circumstantial Evidence of Discrimination

In *Caban-Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990), the Eleventh Circuit

defined direct evidence of discrimination:

> Although the question of whether a plaintiff has presented direct evidence is not
> always entirely clear, direct evidence relates to actions or statements of an
> employer reflecting a discriminatory or retaliatory attitude correlating to the
> discrimination or retaliation complained of by the employee. *See Hill v.
> Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.1988);
> *Thompkins v. Morris Brown College*, 752 F.2d 558, 563 (11th Cir.1985); *Dunning
> v. National Industries, Inc.*, 720 F.Supp. at 929 n. 6.

*Id.* at 1555.  In *Caban-Wheeler,*  the plaintiff was a Hispanic female who claimed that she

was dismissed in order to give her job to a black person. The court held that the statement

that a certain program needed a black director constituted direct evidence of

discrimination.  In  *Earley v. Champion International Corporation,* 907 F.2d 1077 (11th

Cir. 1990), the court stated the direct evidence test another way, and gave an example:

> "Direct evidence of discrimination would be evidence which, if believed, would
> prove the existence of a fact [in issue] without inference or presumption." *Carter
> v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir.1989) (emphasis added); accord
> *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n. 13 (11th Cir.1988); *Rollins*,
> 833 F.2d at 1528 n. 6. "[O]nly the most blatant remarks, whose intent could be
> nothing other than to discriminate on the basis of age, ... constitute direct evidence
> of discrimination." *Carter*, 870 F.2d at 582. One example of direct evidence would
> be a management memorandum saying, "Fire Farley--he is too old." But the
> evidence at issue here, at most, suggests discrimination, leaving the trier of fact to
> infer discrimination based on the evidence; by definition then, the evidence is
> circumstantial. *Rollins*, 833 F.2d at 1529.

*Id.* at 1081-82. On the other hand, statements, even those made by decision-makers, which merely *suggest* a discriminatory motive, are by definition circumstantial evidence. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961 (11th Cir. 1997) ("These statements . . . however inappropriate they may be are not direct evidence of a discriminatory motive with respect to the appellate's claims of failure to promote . . . .") If there is not direct evidence of discrimination, the *McDonnell Douglas* framework is employed.

Discrimination

   *1. Elements of prima facie case of discrimination*: The *McDonnell Douglas* framework should be altered to fit the facts of the case. *Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir. 1991). A *prima facie* case of discriminatory termination may be established by showing the four elements set out in *Coutu v. Martin County Board of Commissioners*, 47 F.3d 1068 (11th Cir. 1995):

> In order to prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.

*Id.* at 1073.[4] An alternative framework may be applied when the discharged plaintiff was not replaced by a person outside the protected class:

> [A plaintiff may show] that he was discharged for misconduct which was nearly identical to that engaged in by one outside of the protected class whom the employer retained. If disciplinary rules are applied discriminatorily, it is unnecessary to show that plaintiff was replaced by a nonminority.

*Hawkins v. Ceco Corporation*, 883 F.2d 977, 984 (11th Cir. 1989)( citations omitted).

2. If a *prima facie* case is made:  If a *prima facie* case is established, the employer has the duty to state legitimate, non-discriminatory reasons for the plaintiff's dismissal. If the employer does so, the plaintiff must show that every reason given by the employer was pretextual.  *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997).


Retaliation

In *Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.*, 988 F.2d 1564 (11th Cir. 1993), the Eleventh Circuit set out the burdens of production in retaliation claims:

> As for the underlying retaliation claims, plaintiff establishes a prima facie case under Title VII by showing that she exercised her protected rights, an adverse employment action occurred, and the adverse action was causally related to the plaintiff's protected activities. *Hamm v. Members of the Board of Regents*, 708 F.2d

---

[4]The *McDonnell Douglas* analysis is altered only if the plaintiff presents direct evidence of discrimination.  *Caban-Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990).

647, 654 (11th Cir.1983). This court has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Simmons v. Camden County Bd. of Ed.*, 757 F.2d 1187, 1189 (11th Cir.), cert. denied, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985).The burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494-95 (11th Cir. 1989). The plaintiff can refute these reasons by proving that they are pretextual. *Id.* Again, the burden of production shifts, but the burden of persuasion remains with the plaintiff. *Id.*

*Id.* at 1571-72. The defendant's burden to come forward with legitimate, non-discriminatory reasons for its actions is "exceedingly light." *Smith v. Horner*, 839 F.2d 1530,1537 (11th Cir. 1988).[5]

## Analysis

### Discrimination claims

Clearly, the facts before the court do not contain direct evidence of discriminatory motive. Therefore, the question is whether there is sufficient circumstantial evidence to

---

[5] If evidence of individual acts of retaliation falls short of making a triable issue of retaliatory conduct, the sum of such evidence cannot do so. *See E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173, 1186-87 (5th Cir. 1996) ("'evidence' that does not imply pretext taken alone does not do so when cumulated"); *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990) (The sum of four nondiscriminatory episodes does not support [a] case anymore than viewing the four episodes separately).

defeat the defendant's motion for summary judgment. The court addresses the following evidence, but all of the evidence referenced by the parties has been considered.

The plaintiff contends that she was discharged for conduct nearly identical to that engaged in by white persons. However, the laughing and other conduct of white employees pointed out by the plaintiff which she states went unpunished was, if similar in type, quite different in context. Laughter and joking in the workplace might be distracting to those who are trying to work. Such laughter, however, is of a different kind from that which verges on hysteria, as the plaintiff's did. Moreover, there is no evidence that this laughter or any other behavior the plaintiff contends was similar to the behavior for which she was disciplined was reported to a supervisor. The evidence does not even reveal the identity of the author of the notes. As to the plaintiff's contention that Kelley investigated the white employees' complaints of harassment against her, but would not investigate the plaintiff's complaints of harassment against these same co-workers, clearly the plaintiff's complaints were not investigated because, as Kelley stated, they were too vague to act upon.[6]   The plaintiff states that her evaluation was unfair, while the evaluations of others were fair, but the plaintiff presents no other evaluations for comparison.

---

[6]The complaints against the plaintiff were not racial in nature.

The plaintiff states that she was not allowed to call a witness, but she does not state that she asked permission to call a witness and permission was refused. Neither does she give the name of a witness she wanted to call; indeed, it appears that Kelley and Gordon talked to everyone who had any knowledge of the complaints lodged against the plaintiff. While it is true that the plaintiff had an overall history of performing her job adequately or even well, she was not discharged for doing a bad job. She was discharged for the reasons set out by Kelley and Gordon, pursuant to company guidelines.

The plaintiff impugns Kelley's motives. The plaintiff contends that Kelley disliked and wanted to get rid of her simply because the plaintiff is a black person. Kelley explained that her reason for designating, several years earlier, applicants as black or white was to develop an applicant flow log. Without more, it cannot be found that such reason indicated racial bias. When Kelley was told to cease such designations, she did. If Kelley was intent on terminating the plaintiff's employment, fulfillment was made possible by the various grounds for dismissal supplied by other persons, as well as the recommendation of Gordon that the plaintiff be dismissed and the concurrence of those who reviewed the record and made the final decision.

The plaintiff cited *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir. 1990), to show that "[d]iscriminatory motive may be proved by direct evidence of the hiring

-26-

authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at hand." *Id.* at 1070, n. 9. The facts in *Beverage Canners* are poles apart from the facts in the case before this court.[7] There is no evidence of racism among the plaintiff's co-workers. There is no basis in fact for the plaintiff's wondering whether or not her fellow workers were members of the Ku Klux Klan.

As to the evidence pointed out by the plaintiff which the plaintiff contends impacts credibility, Kelley's testimony that her recall was insufficient to answer questions concerning the statements she took or received in her investigation of the complaints against the plaintiff was not unusual. The depositional statements of Gordon, Kerr, Northington, and Lindley were not inconsistent with their complaints against the plaintiff, for the complaints against the plaintiff concerned her activities during a particular period of time --- March 10 through March 12 --- and for the most part did not even concern the plaintiff's work. In any event, there are not material factual disputes to make credibility an issue in this case.[8]

---

[7]A person who has the authority to hire is the hiring authority. In *Beverage Canners*, numerous racial slurs were made by the person who made hiring decisions.

[8]Although there is a factual dispute as to whether the plaintiff told Spann she knew more than he knew, it is not a factual dispute which changes results. Even discounting this evidence, there is a plethora of other evidence justifying the plaintiff's termination. Moreover, there is no evidence that Kelley and Gordon acted other than in good faith when they believed Spann over the plaintiff in this matter.

As to the plaintiff's contention that, considering her entire history with the company, her discharge was simply unfair, whether the discharge was unfair is not, in and of itself, actionable. The discharge must have come about because the plaintiff was black.

The plaintiff has not established a *prima facie* case of discriminatory discharge. If, however, it were necessary for the defendant to state legitimate, non-discriminatory reasons for the plaintiff's dismissal, the defendant has done so, and the plaintiff has not produced evidence sufficient to support a finding that those reasons were pretextual.

Retaliation

The plaintiff contends that the alleged discriminatory act — discharging her — was also an act of retaliation. The evidence is insufficient to support a charge of discriminatory discharge, and it likewise is insufficient to support a charge of retaliation.

## Conclusion

For the reasons stated above, the defendant's motion for summary judgment on the plaintiff's discriminatory dismissal and retaliation claims is due to be granted and those

claims dismissed. An appropriate order will be entered.

DONE this 25ᵗʰ day of October, 2001.


Robert R. Armstrong, Jr.
United States Magistrate Judge